# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | |
|---|---|
| DONATUS IRIELE,<br>    Movant, | MOTION TO VACATE<br>28 U.S.C. § 2255 |
| v. | CRIMINAL ACTION NO.<br>1:12-cr-0276-SCJ-JKL-6 |
| UNITED STATES OF AMERICA,<br>    Respondent. | CIVIL ACTION NO.<br>1:22-cv-0088-SCJ-JKL |

## FINAL REPORT AND RECOMMENDATION

Movant Donatus Iriele, a federal prisoner, has filed a counseled 28 U.S.C. § 2255 motion to vacate in which he challenges his 2017 convictions and sentences in this Court for conspiracy to distribute controlled substances, distribution of controlled substances, conspiracy to commit money laundering, "financial transaction" money laundering, and "concealment" money laundering. (*See* doc. 929 at 1; doc. 710 at 1.) The matter is before the Court on the § 2255 motion, the government's answer-response, Movant's reply, and the parties' supplemental filings. For the reasons stated below, **IT IS RECOMMENDED** that the § 2255 motion be **DENIED** and that **no certificate of appealability issue**.

# I.    PROCEDURAL HISTORY

In September 2013, a federal grand jury returned a 28-count second superseding indictment against Movant and five other individuals, charging Movant with conspiring to distribute and dispense controlled substances, in violation of 21 U.S.C. § 846 ("Count 1"), distributing and dispensing controlled substances, in violation of 21 U.S.C. § 841(a)(1) ("Counts 2-4"), conspiring to commit money laundering, in violation of 18 U.S.C. § 1956(h) ("Count 23"), "financial transaction" money laundering, in violation of 18 U.S.C. § 1957 ("Counts 24-26"), and "concealment" money laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i) ("Counts 27-28").  (Doc. 146.)  Movant proceeded to a three-week joint jury trial with his co-defendant, Rosemary Ofume.  The Eleventh Circuit summarized the evidence adduced at trial as follows.

## A. The Pill Mill

Although this case is about Iriele and Ofume's pharmacy, the story starts with [the Atlanta Medical & Research Clinic ("AMARC")].  It was a pain management clinic owned and operated by Godfrey and Bona Ilonzo.  The clinic had multiple locations throughout Georgia, but the one at issue here was located in Lakewood, a low-income neighborhood in Atlanta.  AMARC operated out of an old house surrounded by a barbed wire fence.  It had only two exam rooms and little medical equipment.

Patients and employees described the clinic as small, dirty, rundown, and "sketchy."  A witness testified that at one appointment,

there were "roaches crawling across the exam table."  Another witness testified that the clinic had "[h]oles in the floor, doors that didn't close all the way, bugs, roaches, [and] broken chairs."  The sign out front described it as a clinic for "urgent care, family medicine, internal medicine, adults, women, [and] children," but did not mention pain management.

AMARC didn't operate like a normal clinic or medical facility. Instead of allowing patients to schedule appointments, employees would call patients once a month and tell them what day they could come in to see a doctor.  When patients arrived, they had to put their names on a sign-in sheet and would be seen on a first-come, first-served basis.  As a result, patients often showed up hours before the clinic opened and waited in line in the parking lot.  One patient said there was a "rat race" to be the first person seen.  Eventually the clinic hired a security guard to see that people waited in their cars instead of congregating in front of the building.

One doctor worked per shift, and he or she would normally arrive around 11:00 a.m. but sometimes much later.  The doctor would see between 40 and 100 patients per day, sometimes causing the clinic to stay open until 10:00 or 11:00 p.m.  Physical exams lasted between five and ten minutes and often included nothing more than a basic vitals check, a quick evaluation of whatever area of the body the patient claimed was hurting, and a urine test for drugs.  After the examination, the doctor would write one or more prescriptions.  At least one AMARC doctor would often write prescriptions for patients without ever examining them at all.

In almost all cases, AMARC would prescribe its patients opioids, Xanax, or Soma (a muscle relaxant).  Usually the clinic would prescribe all three of those drugs to the same patient at the same time. The doctors often gave patients prescriptions for the specific drugs that they asked for by name.  The clinic did not accept insurance, credit cards, debit cards, or money orders for doctor visits; it was cash only. First-time patients paid between $300 and $350 for their visit, while

3

returning patients paid $150. Some long-time patients of the clinic paid only $100 per visit.

Former patients and clinic employees testified that most of AMARC's clientele was made up of drug addicts and drug dealers, many of whom traveled from far away and in groups to visit the clinic. Witnesses recalled seeing patients who were underweight, had track marks on their arms, were missing teeth, had lost their hair, and were otherwise "disheveled" and "shaggy." Witnesses also described how patients showed up "high" and would fall asleep, exchange medications, and shoot up drugs in the bathroom while waiting to see a doctor. One witness described AMARC's patients as "living and talking and wanting and breathing for one thing": pills.

### B. The Compliant Pharmacy

Iriele and Ofume's pharmacy, [Medicine Center Pharmacy ("MCP")], was located just a few blocks away from AMARC, an easy walk. Whenever MCP was open either Iriele or Ofume was present. Ofume was the main pharmacist, although others worked there. Iriele had been a licensed pharmacist but no longer was. The Georgia Pharmacy Board had revoked his license in 2007 after he was caught filling forged prescriptions at a different pharmacy he owned.

There is some evidence that the absence of a license did not always keep Iriele from filling prescriptions. Although MCP's former pharmacy technician testified that Iriele did paperwork and rang up customers instead of filling prescriptions, two former MCP customers testified that Iriele filled their prescriptions. Another witness testified that Iriele was "oftentimes" alone in the pharmacy.

Like AMARC, MCP was small, dirty, and "rundown." Customers testified that there were hardly any products on the shelves and that the few that were there were dusty and out of date. And like AMARC, MCP was a cash only establishment—at least when it came to filling prescriptions for controlled substances. No insurance accepted, only cash. According to several former customers, MCP charged a much higher price for opioids in particular than other

4

pharmacies did.  Yet, testing the laws of economics, the higher prices apparently didn't dampen demand for what MCP was offering.

MCP purchased (and hence sold) a lot more opioids than other pharmacies in the area.  According to a data analyst who testified at trial, MCP was the top purchaser of oxycodone in its zip code, far outpacing the other pharmacies in that area.  For example, in 2010 MCP purchased 13 times more oxycodone pills (657,900) than a nearby Walgreens (48,600).  In 2011 MCP purchased seven times more oxycodone pills (500,800) than a nearby Kroger pharmacy (69,800).  MCP's volume of opioid purchases also ranked high on a statewide basis.  One witness presented charts showing the ten pharmacies that had purchased the most oxycodone in the State of Georgia for the years 2009 through 2012.  For three of those four years, MCP was among the top ten.  And for one of those years (2010) it reached the pill purchasing pinnacle, buying more oxycodone than any other pharmacy in the State of Georgia.

### C. The Connection Between the Pill Mill and the Compliant Pharmacy

The vast majority of the prescriptions that MCP filled came from AMARC.  From 2009 until the authorities shut down AMARC in 2012, MCP filled thousands of prescriptions from it.  Those prescriptions accounted for 83% of those that MCP filled and made up more than 90% of the pharmacy's gross sales.  One former customer testified that there was usually a "line of patients" going from AMARC to MCP.

It was no coincidence that most of MCP's prescriptions came from AMARC. The clinic's doctors and office employees often referred patients to MCP to have their prescriptions filled.  This happened with increasing frequency as other pharmacies in the area began refusing to fill prescriptions written by AMARC's doctors.  According to AMARC's patients, clinic employees told them that they could "go right across the street and fill with[ ] no problem."  An

AMARC doctor testified that one of the clinic's owners had told her "Rosemary [Ofume] will fill all of our prescriptions."

AMARC and MCP were often in contact with each other about their businesses. For example, Ofume would regularly call AMARC to let the doctors know that MCP had run out of a particular drug so that the clinic could prescribe one that the pharmacy had in stock. At one point, an AMARC doctor discovered that a clinic employee was issuing forged prescriptions in the doctor's name. AMARC's owners called Ofume and asked her to help them discourage that doctor from reporting the crime to the police. Ofume not only agreed but went to the clinic to talk with the doctor in person. Another time, the owners of AMARC spoke with Ofume about the possibility of them opening a new clinic in Alabama and her opening a new pharmacy close by.

The owners and employees of both establishments were friendly with each other. The owners of AMARC would come into MCP on occasion to chat with Iriele, Ofume, and pharmacy employees. At least once Ofume was seen in the private area behind AMARC where the clinic's doctors parked their cars. And Ofume had the personal cell phone number of one of the AMARC doctors in her address book.

The owners and employees of the two establishments also did favors for each other. MCP employees who wanted to see a doctor at AMARC did not have to make an appointment or wait in line, and they often did not have to pay for the visit. Likewise, when AMARC employees wanted to get a prescription filled at MCP, the pharmacy often gave them a discount or did not charge them at all. And when AMARC employees wanted to fill a prescription for controlled substances, MCP let them use insurance — something that it refused to allow ordinary customers to do.

The working relationship between AMARC and MCP was plain enough that many of AMARC's patients and MCP's customers assumed the two establishments were connected. A former AMARC patient and MCP customer testified that the word among the patients

was that the clinic and pharmacy "were in business together."  He said it seemed "like it was a monopoly" because "you've got the doctor setting the price and ... you've got the pharmacist that the doctor's telling you to go to and they're setting the price at what they want to." Another AMARC patient and MCP customer testified that although she never heard "from the horse's mouth" that the two establishments were connected, it was "hard not to tell" that they were.  Other patients thought that one of AMARC's owners and Ofume were sisters.

### D. The Undercover Visits

The Drug Enforcement Agency eventually caught on to AMARC and MCP and began investigating.  Between late 2010 and early 2011, undercover agent Chris Crutchfield conducted six undercover visits to AMARC and five undercover visits to MCP. During four of those visits an AMARC doctor prescribed Crutchfield controlled substances and MCP filled the prescriptions.  During two of his visits to MCP, Crutchfield in front of Ofume offered to purchase other customers' controlled substances.  Ofume never said anything to Crutchfield about it, and at one point she laughed about it.  On one of those occasions, three other customers took Crutchfield up on his offers to purchase controlled substances from them.  Crutchfield recalled seeing Iriele during only one of his trips to MCP, but he could not remember which trip it was.

In August 2012, the authorities shut down AMARC and MCP. By that time, though, MCP was already having difficulty getting drug distributors to sell it controlled substances.

*United States v. Iriele*, 977 F.3d 1155, 1162-65 (11th Cir. 2020).   The jury convicted Movant of all counts.  *Id.* at 1165.  The district court sentenced Movant to an aggregate of 240 months' imprisonment.  *Id.*

7

Movant appealed, and the Eleventh Circuit affirmed his convictions and sentences. *See id.* at 1185. The instant § 2255 motion followed.

## II.   28 U.S.C. § 2255 MOTION

A federal prisoner may file a motion to vacate his sentence "upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack." 28 U.S.C. § 2255(a). "[T]o obtain collateral relief a prisoner must clear a significantly higher hurdle than would exist on direct appeal." *United States v. Frady*, 456 U.S. 152, 166 (1982) (footnote omitted). An evidentiary hearing is warranted unless "the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b); *see also Diaz v. United States*, 930 F.2d 832, 834 (11th Cir. 1991) (noting that no hearing is required if the record conclusively demonstrates that the § 2255 movant is not entitled to relief).

Movant raises the following claims for § 2255 relief:

I.     Mr. Iriele's Fifth Amendment due process rights and his Sixth Amendment right to notice of the charges against him were violated when he was charged, convicted, and sentenced based

8

upon a defective indictment and faulty jury instructions, neither of which alerted the jury to the correct standard for convicting him.

A.     The indictment in this case was defective and proceeding to trial on this indictment violated Mr. Iriele's Due Process rights.

B.     The legal standard for convicting a pharmacist was not presented to the grand jury or the petit jury.

C.     The jury instructions cannot be said to have cured any defect in the indictment because the instructions did not outline the correct standard.

II.     Trial counsel's constitutionally ineffective assistance deprived Mr. Iriele of a fair trial.

A.     Trial counsel was ineffective for failing to move to compel the government to produce the addresses and DEA numbers for pharmacies included in their "ARCOS" data or to request a subpoena for this information.

B.     Trial counsel was ineffective for failing to secure documents subpoenaed by the government showing the dispensing records from CVS and Publix for Dr. Askari and Dr. Richardson.

C.     Trial [counsel] was ineffective when he failed to object to the admission of irrelevant and prejudicial video-taped evidence.

D.     Should the Court find that the previous issue was preserved for appeal, appellate counsel provided ineffective assistance when they failed to raise it.

E.     Trial counsel was ineffective for failing to impeach Dr. Askari with a police report, documents, recordings, and witnesses that directly contradicted her testimony.

F.      Trial counsel was ineffective for failing to challenge the admission of 404(b) evidence with the above-mentioned police report.

G.      Trial counsel's representation fell below an objective standard of reasonableness when he failed to object to the testimony of Dr. Steven Severyn at trial.

H.      Should the Court find that this claim was properly preserved for appellate review, then it should find that appellate counsel provided ineffective assistance in not raising this issue on appeal.

I.      Trial counsel was ineffective for failing to object and request a mistrial when counsel for defendant Ofume told the jury that all other co-defendants had pleaded guilty.

J.      Appellate counsel provided ineffective assistance when it failed to raise the issue outlined in section I above on appeal.

K.      Trial counsel was ineffective for failing to challenge the incorrect and missing jury instructions.

III.    Government counsel committed misconduct and defense counsel provided ineffective assistance when he failed to object to government misconduct.

A.      The government failed to disclose "ARCOS" address data, which was material to Mr. Iriele's defense.

B.      The government improperly asserted that there would be evidence related to forged prescriptions in an effort to convince the court to admit otherwise irrelevant evidence under Rule 404(b).

10

C.    The government improperly asserted that it had evidence to suggest that the MCP defendants had actual knowledge of what was happening inside the AMARC clinic.

D.    The government made misleading comments and misstated the evidence and law during closing arguments.

IV.    The cumulative errors committed at Mr. Iriele's trial violated his Fifth Amendment … due process rights such that a new trial is required.

V.    Request for certificate of appealability.

VI.    Mr. Iriele's conviction and sentence are invalid because the trial court instructed the jury to use an objective standard to determine whether his actions "were not for legitimate medical purposes or were outside the usual course of professional practice," which is not the correct standard for convicting a pharmacist, or someone who abets a pharmacist.

VII.    Mr. Iriele's conviction and sentence are invalid because the evidence at trial focused on what other pharmacists would do under the same circumstances, rather than showing Mr. Iriele's alleged knowledge that he was doing something unlawful.

VIII.    The Eleventh Circuit applied the incorrect "objective" standard when reviewing the sufficiency of the evidence.

(Doc. 929-1 at 2-4; doc. 936 at 13-19.)

## A.    Grounds I, VI, and VII

In Ground I(A), Movant argues that his indictment was defective because it failed to allege the scienter element for convicting a pharmacist under §§ 841(a) and 846.  (Doc. 929-1 at 7.)  Relying initially on *Rehaif v. United States*, 139 S. Ct.

11

2191 (2019), Movant argues that, to convict a licensed pharmacist, the government must prove that the pharmacist filled a prescription *knowing* that a physician issued the prescription without a legitimate medical purpose or outside the usual course of professional practice.  (*Id.* at 13-15.)  In his supplemental brief, Movant points to the Supreme Court's recent decision in *Ruan v. United States*, 597 U.S. 450 (2022) in support of his position that his indictment was defective for failing to correctly charge the *Rehaif/Ruan* scienter element with respect to the §§ 841(a) and 846 counts.  (Doc. 936 at 12.)  For the same reasons, Movant argues in Ground I(B) that the indictment failed to apprise the grand jury or the jury of the correct scienter standard to convict a licensed pharmacist.  (Doc. 929-1 at 15-16.)  In Ground I(C), Movant argues that the trial court's jury instructions were insufficient to cure the purported defect in the indictment because the jury was erroneously instructed with the incorrect scienter standard.  (*Id.* at 17.)

In Ground VI, raised in Movant's first supplemental brief, he argues that his conviction and sentence must be vacated because the jury was instructed to use the Eleventh Circuit's prior objective standard in determining whether Movant violated §§ 841(a) and 846, which was rejected by *Ruan*.  (Doc. 936 at 13-15.)  Similarly, in Ground VII, Movant argues that the evidence adduced at trial cannot support his

12

§§ 841(a) and 846 convictions because the government's case focused on what other pharmacists would have done under the circumstances, not Movant's knowledge of the unlawfulness of his actions.  (*Id.* at 16-17.)

The government responds that Grounds I, VI, and VII are procedurally defaulted because Movant failed to raise them on direct appeal.  (Doc. 940 at 23-24, 32-36.)  The government further argues that Movant has not alleged cause to overcome the defaults, that his trial and appellate counsels were not ineffective for failing to raise these grounds, and that Movant cannot establish prejudice in light of the overwhelming evidence of guilt adduced at trial.  (*Id.* at 25-36.)

Movant replies that Grounds I, VI, and VII are not procedurally defaulted because the *Ruan* claim is novel and had no reasonable basis in existing law at the time of his direct appeal.  (Doc. 942 at 3-5.)  As a result, Movant argues that these claims were not "truly available" for counsel to raise.  (*Id.* at 5.)  Additionally, Movant asserts that none of his claims should be procedurally barred because he is actually innocent and his convictions resulted in a miscarriage of justice.  (*Id.* at 9.)

Title 21 U.S.C. § 841 makes it a federal crime "except as authorized …, for any person knowingly or intentionally … to manufacture, distribute, or dispense … a controlled substance[.]"  21 U.S.C. § 841(a)(1).  Federal regulations authorize

13

doctors to prescribe controlled substances "for a legitimate medical purpose ... in the usual course of ... professional practice."    21 C.F.R.  § 1306.04(a). Consequently, a licensed medical professional violates § 841 when he knowingly or intentionally distributes or dispenses a controlled substance either not for a legitimate medical purpose or outside the usual course of professional practice. *United States v. Duldulao*, 87 F.4th 1239, 1251 (11th Cir. 2023).

Prior to *Ruan*, prevailing Eleventh Circuit precedent held that § 841's "knowingly or intentionally" scienter requirement did not require proof of a medical doctor's subjective knowledge or intent to act outside the usual course of professional practice.  *See, e.g.*, *United States v. Tobin*, 676 F.3d 1264, 1278-81 (11th Cir. 2012), *abrogated by Ruan*, 597 U.S. 450; *United States v. Williams*, 445 F.3d 1302, 1309-10 (11th Cir. 2006), *abrogated by Ruan*, 597 U.S. 450; *United States v. Merrill*, 515 F.3d 1293, 1305 (11th Cir. 2008), *abrogated by Ruan*, 597 U.S. 450.  Rather, under the prior precedent, "the appropriate focus [wa]s not on the subjective intent of the doctor" but rather on "whether, from an objective standpoint, the controlled substances were dispensed in the usual course of professional practice."  *Tobin*, 676 F.3d at 1282 (internal quotation marks and alteration omitted).

14

However, the Eleventh Circuit's pre-*Ruan* authority established that the scienter standard for convicting a pharmacist under § 841 was different than that for a doctor. While doctors were subject to an objective standard, conviction of a licensed pharmacist required proof "that the pharmacist filled a prescription knowing that a physician issued the prescription without a legitimate medical purpose or outside the usual course of professional practice." *See United States v. Joseph*, 709 F.3d 1082, 1094 (11th Cir. 2013), *abrogated by Ruan*, 597 U.S. 450; *Iriele*, 977 F.3d at 1169.

In *Ruan*, the Supreme Court rejected the Eleventh Circuit's objective scienter standard for medical doctors and held that "[21 U.S.C.] § 841's 'knowingly or intentionally' *mens rea* applies to the 'except as authorized' clause[,] … mean[ing] that once a defendant meets the burden of producing evidence that his or her conduct was 'authorized,' the Government must prove beyond a reasonable doubt that the defendant knowingly or intentionally acted in an unauthorized manner." *See Ruan*, 597 U.S. at 457. Consequently, there is no longer a difference between the standards for convicting a doctor and a pharmacist post-*Ruan*, and neither may be convicted based on proof simply that the defendant acted outside the usual course of professional practice by violating an objective standard of care. *See*

15

*Duldulao*, 87 F.4th at 1251.  Notably, the government may still prove a defendant's requisite knowledge or intent through circumstantial evidence and by reference to objective criteria.  *See Ruan*, 597 U.S. at 467 ("The Government, of course, can prove knowledge of a lack of authorization through circumstantial evidence. … As we have said before, the more unreasonable a defendant's asserted beliefs or misunderstandings are, especially as measured against objective criteria, the more likely the jury will find that the Government has carried its burden of proving knowledge.") (internal quotation marks and citations omitted).

[C]ollateral review is not a substitute for a direct appeal...." *Lynn v. United States*, 365 F.3d 1225, 1232 (11th Cir. 2004) (*per curiam*).  "Generally, if a challenge to a conviction or sentence is not made on direct appeal, it will be procedurally barred in a § 2255 challenge." *United States v. Montano*, 398 F.3d 1276, 1279-80 (11th Cir. 2005) (citation omitted).  "A ground of error is usually 'available' on direct appeal when its merits can be reviewed without further factual development." *Mills v. United States*, 36 F.3d 1052, 1055 (11th Cir. 1994).

Procedural default may be excused if the movant establishes one of two exceptions: (1) cause for the default and actual prejudice from the alleged error, or (2) a fundamental miscarriage of justice, covering "an extraordinary case, where a

16

constitutional violation has probably resulted in the conviction of one who is actually innocent."  *Id.* at 1055-56 (*citing Murray v. Carrier*, 477 U.S. 478, 496 (1986)).  "Cause" requires a showing of some external impediment that prevented a claim from previously being raised.  *See Weeks v. Jones*, 52 F.3d 1559, 1561 (11th Cir. 1995) (*citing McCleskey v. Zant*, 499 U.S. 467, 497 (1991)).  "[F]utility cannot constitute cause if it means simply that a claim was 'unacceptable to that particular court at that particular time.'"  *Bousley v. United States*, 523 U.S. 614, 623 (1998) (citations omitted); *see also United States v. Bane*, 948 F.3d 1290, 1297 (11th Cir. 2020) ("[A] claim is not novel when counsel made a conscious choice not to pursue the claim on direct appeal because of perceived futility, or when the building blocks of the claim were available to counsel.") (citations omitted); *Lynn*, 365 F.3d at 1235 ("In procedural default cases, the question is not whether legal developments or new evidence has made a claim easier or better, but whether at the time of the direct appeal the claim was available at all.")  To demonstrate prejudice, a movant "must shoulder the burden of showing, not merely that the errors at his trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions."  *United States v. Frady*, 456 U.S. 152, 170 (1982).

First, Movant argues that he has shown cause to overcome the procedural bar because his *Ruan* claims in Grounds I, VI, and VII are novel,[1] and, thus, were not "truly available" at the time of his direct appeal.  (Doc. 942 at 3-5).  However, as noted above, pre-*Ruan* precedent established the same scienter standard for pharmacists mandated by *Ruan*, and *Ruan* has no bearing on this case—it disapproved of the Eleventh Circuit standard for doctors, not pharmacists.  Indeed, Movant had a claim under pre-existing precedent available to him that he was convicted under the incorrect § 841 standard, he *did* present that claim on appeal, and the Eleventh Circuit determined that the district court applied the incorrect prior standard for doctors but that the error was harmless because the evidence adduced at trial "overwhelmingly" supported his conviction under the correct subjective knowledge standard.  *See Iriele*, 977 F.3d at 1169-73, 1180.  As such,

_____

[1] To the extent that Movant argues that *Rehaif* and *Ruan* are new rules of constitutional law that apply retroactively to cases on collateral review, the Eleventh Circuit has determined that neither *Rehaif* nor *Ruan* announced a new rule of constitutional law.  *See In re Palacios*, 931 F.3d 1314, 1315 (11th Cir. 2019) ("*Rehaif* … did not announce a 'new rule of constitutional law,' but, instead, clarified [the requirements for] prosecuting an individual under 18 U.S.C. § 922(g) and 18 U.S.C. § 924(a)(2)."); *In re Blanc*, No. 22-12527-F, 2022 U.S. App. LEXIS 24640, at *4 (11th Cir. Aug. 31, 2022) ("*Ruan* did not announce a new rule of constitutional law but, rather, clarified the *mens rea* that the government must prove to convict a defendant under § 841.").

there is no doubt that the "building blocks" of the *Ruan* claims were "available" to Movant on direct appeal.[2]  *See Bane*, 948 F.3d at 1297.  Movant's futility argument does not allege cause to overcome the procedural defaults.

In Ground II(J), Movant alleges that his appellate counsel was ineffective for failing to raise the enumerations in Ground I on direct appeal, and, in Ground II(K), that his trial counsel was ineffective for, *inter alia*, failing to object to the trial court's jury instructions providing the wrong scienter standard for the § 841 offense.  (Doc. 929-1 at 80-81.)  A meritorious ineffective assistance claim "may satisfy the cause exception to a procedural bar."  *United States v. Nyhuis*, 211 F.3d 1340, 1344 (11th Cir. 2000).  To make a successful claim of ineffective assistance of counsel, a defendant must show both that (1) his counsel's performance was deficient and (2) the deficient performance prejudiced his defense.  *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  Counsel's performance is deficient only if

---

[2] Even in cases involving doctors, whose § 841 scienter claims were foreclosed by Circuit precedent, the argument that a medical professional must subjectively know that his conduct was outside the usual course of professional practice to violate § 841 was not novel in this Circuit at the time of Movant's direct appeal. *See, e.g.*, *Tobin*, 676 F.3d at 1279-81 (rejecting defendant medical doctors' contentions that trial court should have permitted "good faith" and "subjective intent" instructions as defenses to § 841 offense); *Williams*, 445 F.3d at 1309-10 (affirming district court's refusal to give defendant doctor's proposed "good faith" instruction); *Merrill*, 513 F.3d at 1305-06 (same).

it falls below the wide range of competence demanded of attorneys in criminal cases. *See Strickland*, 466 U.S. at 687–88. Prejudice occurs when there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

Here, Movant has not established ineffective assistance of counsel as cause to overcome the procedural defaults of Ground I, VI, and VII. As an initial matter, appellate counsel *did* raise that Movant was convicted under the incorrect § 841 scienter standard, and the Eleventh Circuit agreed but found that the error was harmless under the correct standard, which is the same as the standard mandated by *Ruan*. *See Iriele*, 977 F.3d at 1169-73, 1180; *cf. Ruan*, 597 U.S. at 457. Movant has not otherwise shown *Ruan* error in his indictment.

An indictment is sufficient if it (1) presents the essential elements of the offense, (2) is sufficiently specific to inform the defendant of the charge against him, and (3) is sufficiently specific to enable him to plead double jeopardy in any future prosecutions for the same offense. *United States v. Steele*, 178 F.3d 1230, 133-34 (11th Cir. 1999). "[These] requirements are satisfied by an indictment that tracks the wording of the statute, as long as the language sets forth the essential elements of the crime." *United States v. Bascaro*, 742 F.2d 1335, 1348 (11th Cir.

1984), *abrogated on other grounds by United States v. Lewis*, 492 F.3d 1219, 1222 (11th Cir. 2007).

Here, Movant's indictment tracked the wording of § 841 and sufficiently apprised him of the elements of the offense. Indeed, the Supreme Court held in *Ruan* that the statutory text of § 841 includes a requirement that a medical provider knowingly or intentionally act in an unauthorized manner. *See Ruan*, 597 U.S. at 457. Consequently, an indictment that tracks the language of § 841 necessarily incorporates the statute's scienter requirement and sufficiently alleges a federal crime. *See United States v. Morales*, 987 F.3d 966, 979 (11th Cir. 2021) (holding that a pre-*Rehaif* indictment that failed to allege the defendant's knowledge of status was not defective, stating "[s]ince the text of § 922(g) implies a knowledge-of-status element, an indictment that tracks this text sufficiently states a crime against the United States."); *United States v. Balde*, 943 F.3d 73, 90 (2d Cir. 2019) ("If, as the Supreme Court held [in *Rehaif*], the language of the *statute* includes a requirement that the defendant must have knowledge of his illegal status, it is difficult to understand how an *indictment* that tracks the exact language of the statute, and that expressly charges that the defendant violated it, fails on its face to charge that the defendant committed a federal crime.") (emphasis in original).

21

Thus, Movant's indictment was not deficient for failing to explicitly allege the *Ruan* element. *See Morales*, 987 F.3d at 979; *see also, e.g.*, *Diaz v. United States*, No. 20-CV-2150, 2020 WL 2115349, at *4 (S.D.N.Y. May 4, 2020) (finding that "the missing element in the indictment, issued pre-*Rehaif*, did not deprive the Court of jurisdiction over the criminal matter, or otherwise call into question the validity of the indictment"). Appellate counsel did not perform deficiently by failing to raise a meritless challenge to the sufficiency of the indictment. *See Bolender v. Singletary*, 16 F.3d 1547, 1573 (11th Cir. 1994) ("[I]t is axiomatic that the failure to raise nonmeritorious issues does not constitute ineffective assistance.").

With respect to trial counsel's failure to object to the trial court's jury instructions for the § 841 offense, a claim of instructional *Ruan* error, even if preserved, is subject to harmless error review on direct appeal. *See United States v. Ruan*, 56 F.4th 1291, 1298 (11th Cir. 2023). Appellate counsel *did* challenge the § 841 instruction on direct appeal and the Eleventh Circuit reviewed the instruction for plain error, determining that the instruction was erroneous but that the error did not affect Movant's substantial rights in light of the "overwhelming" evidence "that Iriele *knew* the AMARC defendants were issuing prescriptions without a legitimate medical purpose and outside the usual course of professional practice." *Iriele*, 977

22

F.3d at 1180 (emphasis added).  Movant argues strenuously that the Eleventh Circuit's opinion on direct appeal must have applied the incorrect objective standard for doctors and cannot be relied upon post-*Ruan*, (*see, e.g.*, doc. 936 at 18-19), however, this contention is belied by the plain language of the opinion which distinguishes the pre-*Ruan* standard for convicting a pharmacist and speaks at length of the "mountain" of evidence of Movant's subjective knowledge that he was filling prescriptions from a pill mill.  *See Iriele*, 977 F.3d at 1169-72, 1180. Indeed, in *Duldulao*, decided post-*Ruan*, the Eleventh Circuit repeatedly cites its decision in *Iriele* with approval as an example where the "defendant's guilt would have been clear under the correct instruction."  *See Duldalao*, 87 F.4th at 1259.

Because the affected-substantial-rights prong of plain error analysis and the harmless error standard are functionally the same, *see United States v. Monroe*, 353 F.3d 1346, 1352 (11th Cir. 2003), the Eleventh Circuit's decision on direct appeal mandates the conclusion that the § 841 instructional error, even if preserved by trial counsel, would have been deemed harmless for the same reasons stated in the plain error analysis.  *See Iriele*, 977 F.3d at 1180.  In any event, based on this Court's independent review of the record, this Court agrees that the trial court's instructional error on the § 841 charges was, in fact, harmless in light of the

overwhelming circumstantial evidence of Movant's knowledge that the AMARC prescriptions he was filling were medically illegitimate and/or issued outside the usual scope of professional practice. *See Ruan*, 597 U.S. at 467.

For the same reasons, Movant has not shown that he is factually innocent of his §§ 841 and 846 convictions. "The miscarriage of justice exception … applies to a severely confined category: cases in which new evidence shows 'it is more likely than not that no reasonable juror would have convicted [the defendant].'" *McQuiggin v. Perkins*, 569 U.S. 383, 394-95 (2013) (emphasis added). As noted above, the evidence of Movant's guilt, including his subjective knowledge that he was filling medically illegitimate prescriptions, was overwhelming. Movant has not refuted that evidence with new, reliable evidence that was not presented at trial. *See Schlup v. Delo*, 513 U.S. 298, 324, 327 (1995). Movant's contentions in Grounds I, VI, and VII that his indictment and jury instructions were deficient are, at bottom, claims of legal innocence, which is insufficient to satisfy the actual innocence exception. *Bousley*, 523 U.S. at 623-24 ("'Actual innocence' means factual innocence, not mere legal insufficiency.") (citation omitted). Thus, Grounds I, VI, and VII are procedurally defaulted and provide no basis for relief.

### B.    Ground II

In Ground II, Movant raises eleven grounds of ineffective assistance of trial and appellate counsel.  (*See* doc. 929-1 at 2-3.)

#### 1.    Grounds II(A) & II(B)

In Ground II(A), Movant asserts that his trial counsel was ineffective for failing to request address data from the government's Automation of Reports and Consolidated Orders System ("ARCOS") pharmacy dispensation records to counter the government's statistical comparator evidence presented at trial.  (Doc. 929-1 at 18-35.)  Movant notes that the government presented evidence at trial that MCP dispensed vastly more controlled substances than any other pharmacy in its zip code.  (*Id.* at 18-22.)  Movant now argues that statistical analysis of the now-public ARCOS address data obtained by postconviction counsel reveals that other Georgia pharmacies located in close proximity to pain clinics had distribution patterns similar to MCP, dispensing 38% to 89% of all controlled substances in their respective zip codes.  (*Id.* at 25-30.)  As a result, Movant argues that trial counsel was ineffective for failing to obtain the ARCOS address data from the government, despite Movant's and his family's documented requests.  (*Id.* at 20.)  Movant further argues that he was prejudiced by counsel's deficient performance because the government's statistical evidence was presented in a highly misleading

25

manner, and defense counsel and the defense statistical expert were unable to effectively counter the government's evidence. (*Id.* at 33-35.)

Similarly, in Ground II(B), Movant argues that trial counsel was ineffective for failing to obtain dispensing records subpoenaed by the government for the nearby CVS and Publix pharmacies for Dr. Askari and Dr. Richardson, despite Movant's and his family's requests. (*Id.* at 35-36.) Movant asserts that these records show that Publix and CVS also filled AMARC prescriptions until at least 2012, which would have countered the government's core theory of guilt that MCP filled AMARC prescriptions when no other pharmacy would do so. (*Id.* at 38.)

The government responds that Movant has not shown prejudice with respect to trial counsel's failure to obtain ARCOS address data or dispensing data from other pharmacies. (Doc. 940 at 42, 45.) As to Ground II(A), the government notes that the defense did call a statistician at trial and presented a defense pharmacy expert who presented evidence that at least one other pharmacy close to AMARC also distributed large quantities of controlled substances. (*Id.* at 42.) The government contends that there were reasonable strategic reasons for counsel to forgo this type of comparator evidence so as not to "open the door" to cross-examination about whether the comparator pharmacies operated legitimately. (*Id.*

26

at 44-45.)  The government also argues that Movant's statistical comparator data does not establish a reasonable likelihood of a different outcome at trial in light of all the other evidence that Movant knowingly filled prescriptions from an illegitimate pill mill.  (*Id.* at 42.)

As to Ground II(B), the government responds that Movant cannot show prejudice.  (*Id.* at 45-46.)  The government notes that the trial evidence already showed that other pharmacies also filled AMARC prescriptions, and trial counsel effectively cross-examined government witnesses on that point, but that the evidence showed overwhelmingly that other pharmacies started refusing to fill AMARC prescriptions while Movant, who had more awareness of the illegitimacy of AMARC's prescriptions, continued to do so.  (*Id.* at 46.)

Movant replies by reiterating the merits of his claims.  (Doc. 942 at 28-35.)

Here, Movant has not shown that he was prejudiced by his trial lawyer's failure to obtain ARCOS address data or dispensation records from the nearby CVS and Publix pharmacies.  As noted by the Eleventh Circuit on direct appeal, the evidence adduced at trial that Movant knowingly conspired to and did fill illegitimate prescriptions from a pill mill was "overwhelming."  *Iriele*, 977 F.3d at 1180.  Such evidence included the "line of patients" from AMARC to MCP, the

explicit referrals from AMARC to MCP, the fact the MCP accepted only cash for controlled substances, the obviously drug-addicted appearance and behavior of AMARC's patients, the prevalence of out-of-state AMARC patients, the materially identical AMARC prescriptions for large quantities of mixed opioids and other drugs, the telephone coordination between Ofume and AMARC doctors regarding controlled substance availability at MCP, Ofume's involvement in discouraging an AMARC doctor from reporting a stolen prescription pad to the police, a system of preferential treatment at AMARC for MCP employees and preferential treatment at MCP for AMARC employees, and evidence that an undercover agent purchased other patients' drugs at MCP in front of Ofume. *See id.* Trial evidence also showed that either Movant or Ofume were present whenever MCP was open, that Movant sometimes personally filled prescriptions, and that Movant was "oftentimes" alone at MCP. *See id.*

On this record, Movant has not shown a reasonable likelihood that the outcome of his trial would have been different if trial counsel had obtained pharmacy comparator data from ARCOS or dispensation records of other pharmacies. *See Strickland*, 466 U.S. at 694. Movant's evidence that other pharmacies near pain clinics also dispensed large quantities of controlled

28

substances and that other pharmacies filled AMARC prescriptions does not refute the aforementioned "mountain" of circumstantial evidence that Movant knew that AMARC's prescriptions were medically illegitimate.  *See Iriele*, 977 F.3d at 1171-72; *Ruan*, 597 U.S. at 467.  Because Movant cannot establish prejudice with respect to Grounds II(A) and II(B), this Court need not address whether counsel performed deficiently.  *Holladay v. Haley*, 209 F.3d 1243, 1248 (11th Cir. 2000) (holding that, if the defendant makes an insufficient showing on the prejudice prong, the court need not address the performance prong, and *vice versa*).  Grounds II(A) and II(B) do not warrant relief.

### 2.   Grounds II(C), II(D), II(G), and II(H)

In Ground II(C), Movant alleges that his trial counsel was ineffective for failing to object to the admission of undercover video footage of operations at the AMARC clinic.  (Doc. 929-1 at 39-45.)  Movant asserts that there was no evidence that either he or Ofume ever actually set foot inside AMARC, and, thus, that the footage was irrelevant, replete with hearsay, and was highly prejudicial.  (*Id.* at 41-45.)  In Ground II(D), Movant argues that appellate counsel was ineffective for failing to raise Ground II(C) on direct appeal.  (*Id.* at 45-46.)  In Ground II(G), Movant alleges that trial counsel was ineffective for failing to preserve his objection to the expert testimony of Dr. Steven Severyn, a pain management

doctor, whose testimony concerned the standard of care for physicians and was wholly irrelevant and unduly prejudicial to the pharmacist defendants on trial. (*Id.* at 62-65, 71.)   In Ground II(H), Movant argues that appellate counsel was ineffective for failing to raise Ground II(G) on direct appeal. (*Id.* at 74-75.)

The government responds that the video footage and Dr. Severyn's testimony were probative of the illegitimacy of the underlying AMARC prescriptions themselves and of Movant's knowledge of the illegitimacy of the prescriptions. (Doc. 940 at 48-49.) The government also notes that the Eleventh Circuit rejected an enumeration materially similar to Ground II(C) on direct appeal as meritless. (*Id.* at 50.)

Movant replies by reiterating the merits of his claims. (Doc. 942 at 35-39.)

Movant has not shown that his trial and appellate counsels were ineffective for failing to challenge the admission of the undercover video evidence or Dr. Severyn's testimony.   To convict Movant under §§ 841 and 846, the government was required to prove that AMARC's prescriptions were issued not for a legitimate medical purpose or outside the usual course of professional practice, and that Movant knew the same. *See* 21 U.S.C. § 841(a)(1); 21 C.F.R. § 1306.04(a); *Duldulao*, 87 F.4th at 1251.   The undercover video evidence of

AMARC's operations and Dr. Severyn's testimony were both highly probative of the illegitimacy of AMARC's prescriptions and of Movant's knowledge that he was filling prescriptions from an unlawful pill mill, including the conditions outside and around AMARC, the appearance and behavior of AMARC's patients, and the presence of various "red flags" for illegitimate prescriptions. *See Iriele*, 977 F.3d at 1170-71 (discussing Dr. Severyn's testimony as probative of Movant's guilt). Consequently, the evidence was relevant, *see* Fed. R. Evid. 401, and Movant has not shown that the probative value of this evidence was substantially outweighed by undue prejudice, *see* Fed. R. Evid. 403. Trial counsel was not ineffective for failing to make meritless objections. *See Bolender*, 16 F.3d at 1573.

Nor was appellate counsel ineffective for failing to raise the corresponding challenges on direct appeal. *See id.* The same standard utilized by courts to analyze claims of ineffective assistance of trial counsel under *Strickland* also applies to appellate counsel. *Smith v. Robbins*, 528 U.S. 259, 285 (2000); *Brooks v. Comm'r, Ala. Dep't of Corr.*, 719 F.3d 1292, 1300 (11th Cir. 2013). Appellate counsel in a criminal case does not have a duty to raise every nonfrivolous issue requested by the client. *See Jones v. Barnes*, 463 U.S. 745, 751-54 (1983). Rather, the hallmark of effective appellate advocacy is the ability to "winnow out weaker arguments on

31

appeal and [focus] . . . on 'those more likely to prevail' . . . ." *Smith v. Murray*,

477 U.S. 527, 536 (1986).  Indeed, the Eleventh Circuit chastised Movant for

raising 15 grounds for relief on appeal and concluded that 11 of his claims did not

merit extended discussion.[3]  *Iriele*, 977 F.3d at 1165 & n.6 ("[W]e remind counsel

that raising a plethora of issues is not good advocacy.").  As noted above, Grounds

II(D) and II(H) were substantively meritless, and appellate counsel was not

ineffective for failing to raise them.

### 3.    Ground II(E)

In Ground II(E), Movant alleges that his trial counsel was ineffective for

failing to impeach Dr. Askari's testimony with (1) a police report and other

corroborating evidence showing that Ofume called the police in October 2009

about a forged prescription in Dr. Askari's name and (2) an undercover recording

by APD officer Jacob Brown in which Dr. Askari stated that MCP did not have any

Roxicodone and that the undercover officer would have to go someplace else to get

it.  (Doc. 929-1 at 46-53.)  Movant contends that this evidence would have

---

[3] Among the issues that Movant raised on appeal was that the undercover
video contained inadmissible hearsay.  Appellant's Br. at 59-64, *Iriele v. United
States*, No. 17-13455, 2018 WL 4822186 (11th Cir. Sept. 24, 2018).  The Eleventh
Circuit summarily concluded that this ground "lack[ed] merit." *Iriele*, 977 F.3d at
1165 n.6.

impeached Dr. Askari's testimony that MCP feared police scrutiny and that Ofume counseled her not to report a stolen prescription pad, and that she changed her prescribing habits based on what narcotics were in stock at MCP.  (*Id.* at 53-58.)

The government responds that trial counsel did impeach Askari by questioning her about Ofume's call to police in October 2009, and that he has not shown that it was objectively unreasonable for counsel to refrain from further impeaching her with the police report.  (Doc. 940 at 52-53.)  The government also notes that the undercover recording by Officer Brown largely corroborates Dr. Askari's testimony that AMARC doctors communicated with MCP about what controlled substances were presently in stock.  (*Id.* at 53-54.)

Movant replies by reiterating the merits of his claim.  (Doc. 942 at 40-42.)

Here, Movant has not shown that trial counsel's representation fell below an objective standard of reasonableness.  Counsel did, in fact, cross-examine Dr. Askari with the fact that Ofume reported a forged prescription to police in October 2009.  (*See* doc. 756 at 1060-61.)  As a result, the police report and other corroborating evidence were merely cumulative.  Further, Dr. Askari's statements on the undercover video about MCP being out of Roxicodone substantially corroborate her trial testimony that there was a practice where MCP would call

AMARC doctors about being out of certain medications. It was well established at trial that AMARC patients did fill or attempt to fill prescriptions at other pharmacies. As a result, Movant has not shown that trial counsel's strategy on cross examination was so unreasonable as to warrant collateral relief. *See Batista v. Dep't of Corr. & Att'y Gen.*, No. 6:17-cv-748-Orl-18GJK, 2018 WL 11224336, at *7 (M.D. Fla. May 14, 2018) ("Strategic decisions, such as the specific questions to ask on cross-examination, are virtually unassailable on federal habeas review.") (citing *Provensano v. Singletary*, 148 F.3d 1327, 1332 (11th Cir. 1998)); *see also Harrington v. Richter*, 562 U.S. 86, 105 (2011) (emphasizing that the *Strickland* standard is a general one with a substantial "range of reasonable applications").

Nor has Movant shown prejudice in light of the other evidence adduced at trial, as discussed in Parts A and B(1), *supra*. This ground does not warrant relief.

### 4.    Ground II(F)

In Ground II(F), Movant argues that his trial counsel was ineffective for failing to supplement his objections to the Rule 404(b) evidence with the aforementioned police report to counter the government's proffer that it anticipated evidence of forged prescriptions being filled at MCP. (Doc. 929-1 at 58-61.)

The government responds that counsel repeatedly objected to the Rule 404(b) evidence, but the trial court found that it was relevant to issues in the case

beyond forged prescriptions.  (Doc. 940 at 51.)  The government also notes that

Movant raised a materially similar claim on direct appeal and the Eleventh Circuit

rejected it as meritless.  (*Id.* at 51-52.)

Movant reiterates the merits of his claim in reply.  (Doc. 942 at 39-40.)

This ground concerns evidence admitted at trial under Fed. R. Evid. 404(b)

that the Georgia Pharmacy Board revoked Movant's pharmacy license in 2007 and

Movant pled guilty in 2008 to four counts of illegal dispensing under the Georgia

Controlled Substances Act after he was caught filling forged prescriptions at a prior

pharmacy.  *See Iriele*, 977 F.3d at 1163.  As noted by both parties, trial counsel

strenuously objected to the Rule 404(b) evidence pre-trial, during trial, and after

the close of evidence pursuant to Fed. R. Crim. P. 29, arguing specifically that it

was irrelevant because there was no evidence in this case that Movant had filled

forged prescriptions at MCP.  (*See* doc. 758 at 223-24.)  In denying the defense's

Rule 29 motion, the Court stated that its ruling on the admissibility of the Rule

404(b) evidence did not rely entirely on forged prescriptions.  (*Id.* at 225-26.)

Indeed, the Court found that the challenged evidence tended to show that Movant

"was well aware that [he] needed to investigate a wide variety of 'red flags' that

indicated that the prescriptions [he] filled were not for a legitimate medical

purpose," and that the evidence was "crucial to show absence of mistake—*i.e.*
Defendants knew what they were doing was illegal." (Doc. 615 at 5.) On this
record, Movant has not shown that trial counsel's strategy was objectively
unreasonable for failing to supplement his arguments with evidence that was
cumulative of what the trial court had already heard and only addressed one basis
for admission of the Rule 404(b) evidence. *See Provensano*, 148 F.3d at 1332.

Further, Movant raised on direct appeal that the district court abused its
discretion by admitting the Rule 404(b) evidence, arguing that there was no
evidence that he filled forged prescriptions at MCP. Appellant's Br. at 64-66, 2018
WL 4822186. The Eleventh Circuit summarily denied this ground as "lack[ing]
merit." *Iriele*, 977 F.3d at 1165 n.6. Movant has not shown a reasonable likelihood
that counsel's presentation of the police report would have altered that conclusion
in any way. Ground II(F) is due to be denied.

### 5.   Ground II(I)

In Ground II(I), Movant alleges that trial counsel was ineffective for failing
to object and move for a mistrial when Ofume's counsel mentioned during closing
argument that all other co-defendants had pled guilty. (Doc. 929-1 at 76-78.)
Movant contends that this statement, exacerbated by the provision of an unredacted
indictment during jury deliberations, deprived him of a fair trial. (*Id.* at 79-80.)

36

The government responds that Movant has not shown that counsel's performance was deficient or that he was prejudiced in light of the passing references and the trial court's curative instruction. (Doc. 940 at 54-56.)

Movant reiterates the merits of his argument in reply. (Doc. 942 at 42-43.)

Here, Movant has not shown prejudice arising from counsel's failure to object to Ofume's counsel's statements during closing arguments about the other co-defendants' guilty pleas. Ofume's counsel referenced the guilty pleas to highlight the relative lack of co-conspirator testimony in this case, and, consequently, the lack of direct evidence of a conspiracy. (*See* doc. 759 at 33-35.) At no point was the fact of the co-defendants' guilty pleas emphasized by the prosecution or any other party as substantive evidence of Movant's guilt. Further, the trial court issued a curative instruction that "the fact that a witness has pleaded guilty to an offense isn't evidence of the guilt of any person." (Doc. 652 at 7.) Movant cannot show prejudice in light of the curative instruction and the strength of the government's case against him.[4] *See, e.g.*, *United States v. Johnston*, 620 F.

---

[4] Further, to the extent that Movant and Ofume pursued a joint defense at trial, (*see, e.g.*, doc. 758 at 229-30), the disclosure of the co-defendant's guilty pleas by Ofume's counsel while arguing Ofume's and Movant's joint theory of innocence was something tantamount to invited error. *See United States v. Llorca-Meneses*, No. 2:17-cr-38-MHT, 2018 WL 5924515, at *8 (M.D. Ala. Nov. 13,

App'x 839, 847-48 (11th Cir. 2015) (*per curiam*) (introduction of co-defendant's guilty plea was harmless where trial court gave curative instruction and the guilty plea was not emphasized during the remainder of the trial); *United States v. Aguilar*, 188 F. App'x 897, 901 (11th Cir. 2006) (*per curiam*) (finding that introduction of co-defendants' convictions was harmless where the district court provided a curative instruction and the government never suggested that the defendant should be found guilty because his co-defendants were convicted); *United States v. Carrazana*, 921 F.2d 1557, 1568 (11th Cir. 1991) ("[T]he fact that a co-conspirator's guilty plea was made known to the jury will rarely result in plain error even when no cautionary instruction is given."); *United States v. De La Vega*, 913 F.2d 861, 866-67 (11th Cir. 1990) (holding that mention of co-defendant's conviction was rendered harmless by the circumstances, particularly the district court's curative instruction).  Movant is not entitled to relief on Ground II(I).

### 6.    Ground II(J)

In Ground II(J), Movant argues that his appellate counsel was ineffective for failing to raise the issues outlined in Ground I on direct appeal.  (Doc. 929-1 at 80.)

---

2018) (finding invited error where defense counsel introduced evidence of co-conspirator's guilty plea, notwithstanding a lack of any curative instruction).

This Court has already considered and rejected Movant's claim of ineffective assistance of appellate counsel as potential cause to overcome the procedural default of Ground I.  *See* Part A, *supra*.  Ground II(J) does not warrant relief.

### 7.     Ground II(K)

In Ground II(K), Movant argues that trial counsel was ineffective for failing to object to the trial court's jury instructions on the standard for convicting a pharmacist and on the correct law regarding the money laundering charges.  (Doc. 929-1 at 81.)  Petitioner asserts that the challenged instructions were found to be erroneous, and, had the instructional error been preserved, he would have secured a reversal on appeal.  (*Id.*)

The government responds that the Eleventh Circuit applied the correct legal standard in determining that Movant's substantial rights were not affected by the instructional errors and Movant cannot show prejudice.  (Doc. 940 at 30.)

With respect to the trial court's instructions on the § 841 counts, this Court has already considered and rejected Movant's associated claim of ineffective assistance of counsel as potential cause to overcome the procedural default of Ground I.  *See* Part A, *supra.*

Similarly, with respect to the incorrect or missing jury instructions for conspiracy to commit money laundering in violation of § 1956(h) and financial

transaction money laundering in violation of § 1957, the Eleventh Circuit determined on plain error review that the trial court's instructions were erroneous but that Movant had not shown that his substantial rights were affected because "the evidence at trial, which we have already discussed … proved overwhelmingly that Iriele conspired with Ofume to commit promotional money laundering[,]" and financial transaction money laundering. *Iriele*, 977 F.3d at 1183-85.

As discussed in Part A, *supra*, the affects-substantial-rights prong of plain error analysis is functionally the same as harmless error review, to which Movant's claim of instructional error would have been subject, even if preserved. *See Monroe*, 353 F.3d at 1352. As a result, the §§ 1956(h) and 1957 instructional errors would have been deemed harmless on appeal for the reasons stated in *Iriele*, and Movant was not prejudiced by counsel's failure to preserve them. Ground II(K) is due to be denied.

## C.    Ground III

In Ground III, Movant raises four claims that the government committed misconduct and that in each instance his trial counsel was ineffective for failing to object to the misconduct. (Doc. 929-1 at 3-4.)

40

### 1.   Grounds III(A), III(B), & III(C)

In Ground III(A), Movant argues that the government violated *Brady v. Maryland*, 373 U.S. 83 (1963), by suppressing the ARCOS address data discussed in Ground II(A).  (Doc. 929-1 at 82-88.)  In Ground III(B), Movant asserts that the government committed misconduct when it misrepresented that there would be evidence of forged prescriptions to admit the Rule 404(b) evidence discussed in Ground II(F).  (*Id.* at 89-90.)  In Ground III(C), Movant states that the government committed misconduct when it asserted that Movant and Ofume had actual knowledge of the happenings inside the AMARC clinic to support the admission of the undercover video footage discussed in Ground II(C).  (*Id.* at 90-93.)  Movant also alleges that his trial counsel was ineffective for failing to object to the abovementioned instances of government misconduct.  (*Id.* at 3, 88.)

The government responds that the substantive claims of government misconduct in Ground III are procedurally defaulted because Movant failed to raise them on direct appeal.  (Doc. 940 at 56-57.)  The government further argues that that Movant has not shown cause and prejudice to overcome the defaults, including, with respect to Ground III(A), that the address information used to cross examine the defense statistician "was immediately accessible to anyone with the time to conduct a quick internet search with Google Maps," the government did not possess

41

additional address data from ARCOS, and that the address data was not material. (*Id.* at 57-62.)

Movant replies that his claims of government misconduct in Ground III are not procedurally defaulted because they are based on additional evidence that was not part of the record on direct appeal, including the ARCOS data which became available to the public in July 2019.  (Doc. 942 at 8.)  Movant also reiterates his contention that he has shown cause for failure to raise these claims based on ineffective assistance of trial and appellate counsel.  (*Id.*)

This Court agrees that the substantive claims of government misconduct underlying Movant's Grounds III(A), III(B), and III(C) are procedurally defaulted based on his failure to raise them on direct appeal.  *See Lynn*, 365 F.3d at 1232, 1236 (noting that there is no exception to the procedural default doctrine for claims of government misconduct); *Montano*, 398 F.3d at 1279-80.  Additionally, this Court already has rejected Movant's materially similar claims of ineffective assistance of counsel in Grounds II(A), II(F), and II(C) for the reasons discussed in Parts B(1), B(4), and B(2), *supra*—including because Movant was not prejudiced by the lack of ARCOS address data, the Rule 404(b) evidence was properly admitted and Movant could not show prejudice, and the undercover video footage

of AMARC operations was properly admitted and Movant could not show prejudice. Consequently, Movant has not shown ineffective assistance of counsel to overcome the procedural defaults of Grounds III(A), III(B), and III(C), and the corresponding claims of ineffective assistance of counsel raised in Ground III fail for the same reasons. Moreover, Movant cannot establish materiality under *Brady* for the same reasons that he could not establish *Strickland* prejudice on Ground II(A), and, thus, cannot satisfy the cause and prejudice test. *See United States v. Bagley*, 473 U.S. 667, 682 (1985) (noting that the *Strickland* standard for prejudice is virtually the same as the standard for materiality in *Brady* claims). Grounds III(A), III(B), and III(C) do not warrant relief.

### 2. Ground III(D)

In Ground III(D), Movant argues that the government committed misconduct based on eight statements during closing arguments that misstated the evidence and law—including that (1) Robin Sheeter "almost died on her way back from this clinic and this pharmacy," (2) that Ofume "waltzed right into that clinic to get her own pain pills from these people," (3) that Movant was in the conspiracy just because he was at the pharmacy, (4) that Ofume had the phone numbers of AMARC employees in her phone book, (5) that MCP was open on Sundays because AMARC was open on Sundays, (6) that Ms. Byrd had to "constantly

check" for counterfeit bills, (7) that the jury could find Movant guilty of structuring money laundering when he was not charged with structuring money laundering, and (8) that all other pharmacies had stopped filling AMARC prescriptions. (Doc. 929-1 at 93-105.)  Movant also argues that his trial counsel was ineffective for failing to object to the government's closing argument.  (*Id.* at 93.)

The government responds that the substantive claim of prosecutorial misconduct in Ground III(D) is procedurally defaulted based on Movant's failure to raise it on direct appeal and that Movant has not shown cause and prejudice to overcome the default.  (Doc. 940 at 62-67.)

Movant replies that Ground III(D) is not procedurally defaulted because it relies on affidavits from Ms. Sheeter and her husband procured by postconviction counsel and he has shown cause for failure to raise this claim based on ineffective assistance of trial and appellate counsel.  (Doc. 942 at 7-9.)

In determining whether prosecutorial statements made during closing argument were so improper as to deny a criminal defendant of a constitutionally fair trial, those statements must be evaluated in light of the entire trial record. *United States v. Young*, 470 U.S. 1, 11-12 (1985).  "The relevant question is whether the prosecutor's comments 'so infected the trial with unfairness as to make

44

the resulting conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (*quoting Donnelly v. DeChristoforo*, 416 U.S. 637 (1974)).  In order for prosecutorial comments to entitle a defendant to postconviction relief, those comments must have been improper and they must have impacted the jury's ability to fairly judge the evidence at trial, rendering the trial fundamentally unfair. *Young*, 470 U.S. at 12.

Here, the prosecutor's comments on Sheeter's overdose, Ofume's personal prescriptions from AMARC doctors, Movant's involvement in the conspiracy, Ofume's phone book, MCP's Sunday hours, counterfeit bills, and other pharmacies' refusal to fill AMARC prescriptions reflected the government's suggestions on what the jury should find from the evidence before it.  *See Iriele*, 977 F.3d at 1162-65; *United States v. Bernal-Benitez*, 594 F.3d 1303, 1315 (11th Cir. 2010) ("[T]he prosecutor may suggest what the jury should find from the evidence before it.").  Further, the comment on structuring money laundering was harmless for the reasons discussed by the Eleventh Circuit on appeal and in Part B(7), *supra*.  *See Iriele*, 977 F.3d at 1183-85.  Movant has not shown that any of these comments rendered his trial fundamentally unfair, particularly when viewed in light of the entire trial record and "overwhelming" evidence of guilt.  *See*

*Young*, 470 U.S. at 11-12; *Iriele*, 977 F.3d at 1180.  Trial and appellate counsels were not ineffective for failing to raise meritless objections, *see Bolender*, 16 F.3d at 1573, and Movant has not shown ineffective assistance of counsel to overcome the procedural default.  Ground III(D) is procedurally defaulted with respect to the substantive claim of prosecutorial misconduct and the corresponding claim of ineffective assistance of counsel is due to be denied.

### D.    Ground IV

In Ground IV, Movant alleges that he is entitled to a new trial based on the cumulative effect of the numerous errors alleged in the § 2255 petition, even if the challenged errors are not individually reversible.  (Doc. 929-1 at 105-111.)

The government responds that all of Movant's individual claims of error are without merit and that there is "nothing to accumulate."  (Doc. 940 at 67.)

In his reply, Movant reiterates his claim that the cumulative effect of the errors alleged in his § 2255 motion undermines confidence in the jury's verdict. (Doc. 942 at 57.)

"Under the cumulative-error doctrine, 'an aggregation of nonreversible errors . . . can yield a denial of the constitutional right to a fair trial, which calls for reversal.'"  *United States v. Hesser*, 800 F.3d 1310, 1329-30 (11th Cir. 2015) (*per curiam*) (citation omitted).  In addressing cumulative error, a court must first

examine each claim individually and then examine any error in the aggregate and the trial as a whole to determine whether a defendant was afforded a fundamentally fair trial. *United States v. Calderon*, 127 F.3d 1314, 1333 (11th Cir. 1997). "'The total effect of the errors on the trial will depend, among other things, on the nature and number of the errors committed; their interrelationship, if any, and combined effect; . . . the strength of the government's case[;] and the length of trial.'" *United States v. House*, 684 F.3d 1173, 1197 (11th Cir. 2012) (citation omitted).  Having examined each individual claim and thoroughly reviewed the record, including the Eleventh's Circuit's opinion on direct appeal, this Court finds that the aggregate effect of the errors alleged by Movant, most of which are completely without merit, did not render his three-week jury trial fundamentally unfair. *See also Morris v. Sec'y, Dep't of Corr.*, 677 F.3d 1117, 1132 (11th Cir. 2012) (concluding that habeas petitioner's cumulative error claim failed because none of his individual claims of error had any merit and, thus, there was "nothing to accumulate").  Ground IV does not warrant relief.

### E.   Ground VIII

In Ground VIII, Movant argues that the Eleventh Circuit reviewed the sufficiency of the evidence on direct appeal and affirmed his convictions using an objective scienter standard.  (Doc. 936 at 18-19.)  Movant contends that this was

error under *Ruan*. (*Id.* at 18.) As a result, Movant asserts that the Eleventh Circuit's decision on appeal cannot be relied upon to uphold his convictions. (*Id.* at 19.)

The government responds that Movant cannot obtain review of the Eleventh Circuit's decision on direct appeal in a § 2255 motion. (Doc. 940 at 37.)

Movant does not specifically address the government's contention that Ground VIII is non-cognizable in his reply brief. (*See generally* doc. 942.)

To the extent that Movant enumerates as a separate ground for relief that the Eleventh Circuit applied an erroneous standard on direct appeal, "assertions of error by an appellate court are not cognizable in § 2255 proceedings." *Freeman v. United States*, No. 16-17185-J, 2018 WL 6318358, at *9 (11th Cir. July 31, 2018) (unpublished); *see also, e.g.*, *Pimentel v. United States*, No. 96 Civ. 5891(JFK), 2008 WL 2151796, at *5 (S.D.N.Y. May 21, 2008) (district court lacks authority to review a claim that the court of appeals erred); *Harris v. Maldonado*, No. 3:04-0100 HFFJR, 2006 WL 3909718, at *3 (D.S.C. Jan. 10, 2006) (district court was not the forum to review and correct allegations of error by the appellate court). To the extent that Movant merely argues that the Eleventh Circuit's sufficiency determination on appeal should not foreclose § 2255 relief post-*Ruan*, this

48

contention has already been discussed in Part A, *supra*.  Ground VIII is non-cognizable and does not warrant relief.

Accordingly, because none of the grounds presented warrant relief,[5] **IT IS RECOMMENDED** that the § 2255 motion be **DENIED**.

## III.   CERTIFICATE OF APPEALABILITY

Pursuant to Rule 11(a) of the Rules Governing Section 2255 Proceedings, "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant. . . . If the court issues a certificate, the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)."   Section 2253(c)(2) states that a COA may issue "only if the applicant has made a substantial showing of the denial of a constitutional right."  A substantial showing of the denial of a constitutional right "includes showing that reasonable jurists could debate whether (or, for that matter, agree that) the [motion to vacate] should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further."  *Slack v.*

---

[5] Movant's enumerated Ground V does not present any basis for § 2255 relief but argues that he should be entitled to a certificate of appealability ("COA") in the event that his motion is denied.  (Doc. 929-1 at 111-12.)  Movant's entitlement to a COA is discussed below.

*McDaniel*, 529 U.S. 473, 484 (2000) (quotation omitted).  Because reasonable jurists would not debate the resolution of the issues presented, **IT IS FURTHER RECOMMENDED** that a COA be **DENIED**.  *See id.*  If the District Court adopts this recommendation and denies a COA, Movant is advised that he "may not appeal the denial but may seek a certificate from the court of appeals under Federal Rule of Appellate Procedure 22."  28 U.S.C. foll. § 2255, Rule 11(a).

## IV.   CONCLUSION

For the reasons stated above, **IT IS RECOMMENDED** that the 28 U.S.C. § 2255 motion be **DENIED** and that **no certificate of appealability issue**.

The Clerk of Court is **DIRECTED** to terminate the referral to the undersigned United States Magistrate Judge.

**SO RECOMMENDED**, this 14th day of February, 2024.

_____
JOHN K. LARKINS III
United States Magistrate Judge